IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
August 4, 2015 Session


STATE OF TENNESSEE v. TRAVIS BOYD and RODRICCUS FUNZIE


Appeal from the Criminal Court for Shelby County
No. 1201930    James C. Beasley, Jr., Judge

_____

No. W2014-00676-CCA-R3-CD  -  Filed December 23, 2015
_____


Appellants, Travis Boyd and Rodriccus Funzie, were jointly indicted and tried for first degree murder.  Upon verdicts of guilty as to each appellant, the trial court imposed a mandatory sentence of life in prison.  Appealing their convictions, both appellants challenge the sufficiency of the convicting evidence and the trial court's admission of recorded jail conversations.  Appellant Boyd challenges the trial court's ruling allowing testimony concerning an altercation between Boyd and the victim that occurred on the Saturday night prior to the murder; the admission of evidence gathered during the course of Boyd's allegedly illegal forty-eight-hour hold; the trial court's ruling allowing identifications of Boyd by five witnesses; and the State's failure to provide complete discovery.  Appellant Funzie challenges the trial court's admission of two witnesses' statements as substantive evidence.   Following our review, we affirm the judgments of the trial court.

 Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

ROGER A. PAGE, J., delivered the opinion of the Court, in which ALAN E. GLENN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Paul J. Springer (at trial and on appeal) and Varonica R. Cooper (at trial), Memphis, Tennessee, for the Appellant, Travis Boyd.

Richard S. Townley (on appeal); Marvin Earl Ballin and Benjamin Katz (at trial), Memphis, Tennessee, for the Appellant, Rodriccus Funzie.

Herbert H. Slatery III, Attorney General and Reporter; Tracy L. Alcock, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Pamela Fleming-Stark

and Reginald Henderson, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

This case concerns the shooting of the victim, Antuan Farris, at the barber shop where he was employed. Appellants Boyd and Funzie[1] were both indicted for first degree murder for their participation in the shooting.

I. Facts and Procedural History

A. August 22, 2013 Continuation of Motion to Suppress

At the commencement of this hearing, the court stated on the record, "I think this is further testimony on a motion to suppress. I think I've already ruled on everything but the one witness left; is that right?" Counsel agreed, stating that the only witness remaining was Cory Hemphill. The State questioned Mr. Hemphill about his whereabouts on September 13, 2011. Mr. Hemphill stated that he was present at a barber shop in the area of Mountain Terrace and Frayser Boulevard on that date. Mr. Hemphill was familiar with Boyd and his father and observed Boyd that day around 2:30 p.m. Mr. Hemphill stated that he "just seen [sic] [Boyd] walking from the end of the store towards the barber shop and he started shooting . . . at [the victim]. Him [sic] and [the victim] said something and I seen [sic] [the victim] take off running and I seen [sic] [Boyd] shooting behind him." Mr. Hemphill recalled hearing three to four gunshots.

At this time, Mr. Hemphill had pulled his vehicle to the side of the road. He turned around and exited his vehicle to locate the victim and assess his condition. He found the victim lying in the back of a house, bleeding. The victim told him that "'[Narvin Boyd's][2] brother Travis . . . shot him.'" Mr. Hemphill remained at the scene and spoke with police, and then he subsequently gave a statement at the police department. At that time, Mr. Hemphill identified Boyd from a photographic line-up.

On cross-examination, Mr. Hemphill stated that he had known Boyd for five to six years. He did not have a "relationship, per se," with Boyd; he simply knew of him

---

[1] Because this case involves two appellants, we will refer to each by his surname or collectively as "appellants."

[2] Because Boyd has a brother, Narvin Boyd, who was involved in this matter, we will refer to him as "Narvin Boyd" to avoid confusion. At times, Narvin Boyd is also referred to by his nickname, "Da Da."

through Boyd's father. He clarified that on the day in question, he pulled up to the barber shop and saw Boyd walking across the parking lot. Mr. Hemphill said that when Boyd walked in front of the victim, he "look[ed] like he had something in his pocket, like he was, you know, up to something." Other individuals were standing with the victim—Courtney, Adoll, and Michael (no surnames given). Mr. Hemphill described that the barber shop was located at the corner of a strip mall that contained other stores. After the shooting, the victim ran alongside the strip mall past the other store fronts, and the three individuals ran around the back of the strip mall.

Mr. Hemphill stated that when the police arrived, they took his contact information and asked him what he had seen. He told the officers what the victim had told him about the identity of the shooter. Mr. Hemphill remained at the scene for fifteen to twenty minutes, and he denied seeing Boyd brought back to the scene by police during that time.

With regard to the photographic identification, Mr. Hemphill did not recall the time of day that he made the identification or the name of the officer who administered the line-up. He stated that at the time he viewed it, the only information written on it was the offense number. Mr. Hemphill wrote the name "Travis Boyd" under Boyd's photograph, and he signed it. He said that his identification of Boyd was based on his previous knowledge of him and confirmed that he saw Boyd shoot the victim.

Based upon the testimony, the trial court denied Boyd's motion to suppress Mr. Hemphill's identification of him.

## B. Trial

Appellants' trial began on November 20, 2013. The State called the victim's mother, Mae Smith, to establish the date of the victim's death. The State's next witness was Rami Habhab, who, at the time of the murder, owned an EZ Store[3] located at the corner of Frayser Boulevard and Mountain Terrace that was part of the strip mall. He maintained a video surveillance system at his business, and he allowed police access to his system so that they could copy the footage captured outside of his store on the day in question. Through him, the video and multiple still photographs were introduced into evidence and viewed by the jury.

The videotape provided by Mr. Habhab showed Funzie's green Cavalier as it pulled into the EZ Store's parking lot. The driver's side door opened, and a black male

---

[3] This business is described by various witnesses as "EZ Store," "EZ Mart," and "EZ Shop." However, because the business owner referred to it as an "EZ Store," we will maintain that nomenclature throughout this opinion.

wearing clothing that matched the description of what Funzie was wearing on the date in question exited the vehicle. The male walked around the front of the vehicle and out of camera range. Seconds later, the victim ran past the Cavalier from the opposite direction, followed presumably by Funzie. Both men ran around the corner of the building. Funzie then returned to his vehicle, allowed the person who was firing the weapon to enter the vehicle, and drove away.

The State then called Ryan Henderson, who testified that the victim had been his barber and had been "like a big brother to [him]." Mr. Henderson said that on Saturday, September 10, 2011, he finished work around 9:00 p.m., as did the victim. The two men purchased a bottle of liquor and drove to the residence of an individual known as "Jarvis." The victim walked up to speak with people at the house, and Mr. Henderson remained standing beside the vehicle. About fifteen minutes later, Boyd's brother, Narvin Boyd, began walking toward them, "and he's pointing out two guys with the white shirt[s]." Mr. Henderson wore a white button-down collared shirt at the time, and the victim wore a white and blue-striped collared shirt, so he believed that Narvin Boyd was pointing toward them. Neither the victim nor Mr. Henderson knew why Narvin Boyd was pointing them out. Mr. Henderson continued, "And like three minutes later, [Boyd] pulled up in the SUV truck and came out with the gun to me and [the victim]. In three or four seconds he ran. [The victim] ran." Mr. Henderson said that the victim never asked any questions or said anything before he began running. Mr. Henderson said that after about three seconds he "caught on" and began to run, also. He had no idea what had triggered the confrontation, but he "guessed" that the confrontation was related to the subsequent murder of the victim.

Mr. Henderson recalled that on the following Tuesday, he left his grandmother's house and drove to the EZ Store to purchase gas. Before doing so, he walked into the barber shop to speak to the victim. Mr. Henderson was accompanied by a friend, Tavaris (no surname given). Mr. Henderson then walked into the EZ Store to pay for his gas. As he was exiting, Tavaris, also known as "T.B.," approached him and told him that there were some "guys outside." Upon exiting the store, Mr. Henderson observed that it was Narvin Boyd and that he was driving a red Cadillac. Mr. Henderson stood outside of the store talking with a young lady, and Narvin Boyd approached him and asked, "'What's up from the other night[?]'" Mr. Henderson replied that he was unsure what Narvin Boyd was talking about. He described, "I looked around and checked my surroundings and [Narvin Boyd] hit me in the back of the head with the gun. That's when I fell against the store door and I ran in Black's Barber Shop and . . . said I just got hit in the head with a gun." Mr. Henderson said that he then walked back outside to be sure that no one was chasing him. He entered his car and began to leave. As he was leaving, he saw Steve Chambers and some other individuals pumping gas at pump four.

Mr. Henderson recalled that when he left, he saw his father at the Victory gas station across the street. He drove to his grandmother's house, which was nearby, and sat down. About five minutes later, he heard gunshots. He drove back to the scene and learned that the victim had been shot.

At that point in the proceedings, the State asked Mr. Henderson if he could identify the individual who pulled the gun on him and the victim on Saturday night. Mr. Henderson indicated Boyd and said, "I think that's him right there with the blue shirt. The defense objected that it was not a positive identification, but the trial court allowed it with "whatever weight [the jury] want[s] to give it."

On cross-examination, Mr. Henderson explained that he and the victim drove to Mr. Jarvis's house because the victim wanted to check on an incident involving Mr. Jarvis wherein he had been robbed earlier in the day. Mr. Henderson stood on the edge of the road while the victim went up to the house and spoke with some of its occupants. Narvin Boyd, who had been sitting on the porch at a house across the street, began to walk over while pointing out two individuals wearing white shirts. Mr. Henderson said that this caused him to wonder what he had done because he was not acquainted with Narvin Boyd. Mr. Henderson kept hearing Narvin Boyd saying "white shirt, two white shirts." Within approximately three minutes, Boyd's vehicle turned the corner, and Boyd was pointing a gun at Mr. Henderson and the victim. The victim fled, followed by Mr. Henderson. Mr. Henderson described the gun Boyd wielded and said that he thought it was the same gun with which Narvin Boyd struck him the following Tuesday.

Mr. Henderson testified that when they left Mr. Jarvis's neighborhood, he and the victim traveled to the residence of the victim's girlfriend, where they remained until Monday. He stated that he went to the barber shop on Tuesday morning and that the incident occurred around 9:00 or 10:00 a.m. He clarified that when he saw his father at the Victory gas station, he told his father that he had been struck in the head with a pistol and that his father followed him to his grandmother's house. There, Mr. Henderson's father assessed his injuries. Soon, they heard gunshots, and Mr. Henderson's father advised him to return to the scene and inform the police of what had occurred earlier.

Cory Hemphill, the victim's brother-in-law, was the State's next witness. The victim had just cut Mr. Hemphill's hair at Black's Barber Shop on Tuesday, September 13, 2011, around 2:30 p.m., and Mr. Hemphill had been standing outside of the barber shop talking to someone for thirty to forty-five minutes. As he entered his vehicle and sat down, Mr. Hemphill observed Boyd "come from inside of the store walking up the sidewalk and walk up on [the victim]." He clarified that he knew Boyd through Boyd's father. Mr. Hemphill saw the two men talking but could not hear what was being said. At that time, the victim began to run, and Boyd gave chase, pulling a weapon from his

pocket or waistband and shooting at the victim while he ran. The two men ran toward the EZ Store.

Mr. Hemphill stated that he followed the victim to render aid. He located the victim in a backyard on Mountain Terrace, which was nearby. Mr. Hemphill said that the victim had a large hole near his collarbone. The victim told him that "[Narvin Boyd's] brother shot him." Mr. Hemphill identified Boyd in court as the person whom he saw shoot the victim. Mr. Hemphill testified that at the scene, he also saw someone known to him as "Little Ryan," or Ryan Henderson. He witnessed Narvin Boyd strike Mr. Henderson with a gun.

On cross-examination, Mr. Hemphill admitted that he had been convicted of drug charges previously but denied that the barber shop was a "front" for selling drugs or that he had been selling drugs at the barber shop on the day in question. He clarified that when Boyd approached the barber shop, the victim was seated on a garbage can outside of the shop talking with Courtney Adair. Mr. Hemphill recalled that the police asked him to give a description of the person who shot the victim, and he described the shooter as being "dark-skinned," around 5′6″, and wearing Air Max shoes and khakis. However, defense counsel pointed out that Mr. Hemphill described the shooter as having a medium complexion and being between 5′9″ and 6′0″.

The State called Alvin Shaw as its next witness. Mr. Shaw was present with the victim on the Saturday prior to his death and was with him when he was shot. Mr. Shaw stated that on Saturday, there was an altercation of some sort but that he did not know the cause of it. While he was standing there, the victim became engaged in an argument with Narvin Boyd, and shortly thereafter, Boyd arrived and pulled a gun on the victim. The victim ran. Mr. Shaw stated that at that point, "it was over."

Mr. Shaw testified that on the following Tuesday, he was as at the barber shop when Mr. Henderson ran inside and told them that Narvin Boyd had struck him in the head with a gun. Mr. Shaw and the victim ran outside to ascertain the situation, but everyone was gone. They walked next door to the EZ Store and purchased beer then sat outside the barber shop drinking. About fifteen minutes later, Boyd arrived and addressed the victim, "'[A]in't you the same n***** that got that beef with my brother[?]'" The victim replied that they had "squashed that s***." Mr. Shaw stated that "mayhem" erupted at that point.

Mr. Shaw recalled that the victim had not paid any attention to Boyd; he had continued texting on his telephone and had not looked up until Boyd "upped" his gun at the victim. At that point, the victim ran toward Mountain Terrace, and Mr. Shaw ran toward Frayser Boulevard. Mr. Shaw eventually came back toward the barber shop with the intention of driving his vehicle to locate the victim, but he saw the victim in a

backyard across the street before he could drive away and proceeded toward him. Mr. Shaw said that the victim was gasping for breath and had a hole in his body that was "pouring out blood." Mr. Shaw removed his own shirt, poured water on it, and applied it to the victim's wound, reassuring him that an ambulance was en route.

During the investigation, Mr. Shaw was shown a photographic array, and he identified Boyd from the array. When he made the identification, he wrote below Boyd's photograph, "That's the guy that walked up on us and started shooting [the victim] and he also pistol[-]played [the victim] Saturday night." Mr. Shaw also identified a photograph of Narvin Boyd from an array, below which he wrote, "That's Da Da [a/k/a Narvin Boyd]. He pulled up on the -- in the Cadillac before the shooting started."

Mr. Shaw elaborated that regarding the altercation on Saturday, when he arrived at the scene, the victim was not saying anything. Narvin Boyd was talking to the victim, saying that he was not about to rob anyone and that they had him "messed up." After that, Boyd drove up and asked Narvin Boyd "which one it [was]" because there were two individuals wearing white and blue shirts. Mr. Shaw stated:

> So [the victim] and Little Ryan [Henderson] both had a white and blue shirt on, so [Boyd] upped the gun on both of them. But he pointed at Little Ryan first and asked him was this him and then he was like no. Then when he pointed at [the victim], [and] [the victim] just got to running.

With regard to the Tuesday incident, Mr. Shaw explained that he just "sat there" until Boyd "got ready to up his pistol." He said, "By the time he got ready to cock it, I was in motion running." Mr. Shaw heard six to seven shots fired in rapid succession. He recalled that Boyd was wearing a gray or brown shirt with a lime green stripe at the bottom, a hat, and Air Max tennis shoes. He expounded that he did not pay much attention to Boyd when he first approached because Boyd "looked young, . . . like all the other school kids."

Mr. Shaw explained that at the time, he thought that Boyd had left with Narvin Boyd because he did not see any other car in which Boyd could have fled. He agreed that he knew Cory Hemphill and that he saw Mr. Hemphill that day. Mr. Shaw said that he was parked behind Mr. Hemphill and that he had to move his vehicle so that Mr. Hemphill could leave. He recalled that Mr. Hemphill left "before everything took place."

Mr. Shaw was shown articles of clothing and was asked if he could identify any of them. He identified the Air Max tennis shoes as being worn by Boyd on the day in question, but he could not unequivocally identify the shirt or the jeans he was shown. Further, with regard to the Saturday incident and the involvement of Mr. Jarvis, he confirmed that Mr. Jarvis was a little "slow."

The State called Michael Pitts, a licensed barber who was working at Black's Barber Shop on September 13, 2011. Mr. Pitts recalled that he and the victim had just returned from the EZ Store around 2:30 that afternoon and were sitting outside of the barber shop drinking beer. Boyd walked up and said that someone had a problem with his brother, and then he fired his weapon. Mr. Pitts and Boyd fled in opposite directions. Mr. Pitts was familiar with Boyd prior to this date because Boyd had attended school with Mr. Pitts's brother. At some point, Mr. Pitts stopped and returned to the barber shop. He, Mr. Henderson, Adrian Moore, and someone known as "A-Dog" began to search for the victim. They located the victim in a backyard, and he was "gasping for air" after having been shot. Mr. Pitts remained on the scene but did not speak with police. He later gave a statement and identified Boyd from a photographic array.

Mr. Pitts stated that to his recollection, Mr. Henderson had been at the barber shop earlier in the day but that he was no longer present when the victim was shot. He also acknowledged that "A-Dog" could have walked with them to the EZ Store and that he was sitting outside when Boyd approached.

Courtney Guy, the State's next witness, testified that he was present at the barber shop when the victim was shot. He explained that he and some other individuals were sitting outside when Boyd exited a car, approached them, and asked what was going on between the victim and Narvin Boyd. Mr. Guy relayed that the victim told Boyd that the issue had been "squashed" but that Boyd drew his gun and started firing. The victim began to run, and Mr. Guy sought shelter behind an automobile. He watched as Boyd ceased fire and fled the scene as a passenger in a small turquoise car. Thereafter, he joined in searching for the victim, whom they found in a backyard across the street. Boyd was yelling something about "Da Da's brother." Mr. Guy remained at the scene and gave a statement to the police. He also identified Boyd from a photographic array.

Mr. Guy described Boyd's clothing that day as a "[s]nap back hat, lime green colors, with jeans and a t-shirt, and some really loud Air Max." He clarified that when he identified Boyd in the photographic array, no one had told him whom to circle. The writing that was on the array was placed there by Mr. Guy; he wrote, "This is the guy that shot [the victim] . . . ."

On cross-examination, Mr. Guy acknowledged that prior to that day, he was unfamiliar with Boyd and had never met him. He also emphasized that he worked "with clothing and shoes and fashion all day, so that's the first thing [he] look[ed] at on anybody," which was why he was certain of Boyd's clothing, including the lime green stripes on his shoes.

The State called Andrea Carlton as its next witness. Ms. Carlton testified that Boyd, also known as "T-Roc," was the best friend of her baby's father. Funzie was also a

-8-

close friend of her baby's father. Ms. Carlton denied any memory of September 13, 2011, any knowledge of the locations in question, and any recollection of giving a statement.[4] She also denied having viewed a video of the incident on the following day. Upon examination by the State as a hostile witness, Ms. Carlton read from her statement and said that appellants were at her house on the day in question. She read that Boyd was wearing an Aeropostale shirt, a black and green hat, and Air Max tennis shoes, while Funzie was wearing black jeans, a black hat, solid red shoes, and a white "wife beater" undershirt. Funzie was driving a green Cavalier that day. Ms. Carlton also agreed that she identified both appellants in photographic arrays and confirmed that her signature was on the arrays. She further acknowledged that she was taken to the police station because her name had been provided as an alibi witness but that she was unable to provide an alibi for either appellant.

On cross-examination, Ms. Carlton claimed that she was using drugs at the time she gave her statement and that she was "[a]bout a nine, ten" on a scale of one to ten measuring her level of intoxication. She claimed to have ingested Lortab and Xanax before giving her statement. She disavowed any memory of the questions asked of her by Lieutenant Murray as well as having viewed the video surveillance tape.

The State called Memphis Police Department ("MPD") Officer Darron Smith as its next witness. Officer Smith and his partner responded to information regarding a shooting at the EZ Store on September 13, 2011, around 2:30 p.m. When they arrived, he observed a large group of people assembled at a residence across the street from the commercial building. He discovered the victim lying in the backyard, bleeding from a chest wound. Officer Smith asked the victim who shot him, and the victim responded that it was "Da Da's brother." Another individual was kneeling beside the victim, rendering aid. Shortly thereafter, Officer Smith and his partner began clearing the crowd to protect the crime scene. He testified that the victim died either in the backyard or at the hospital. On cross-examination, Officer Smith acknowledged that after the victim named "Da Da's brother" as the shooter, individuals on the scene began saying, "Travis."

MPD Officer Manta Massey was the State's next witness. Officer Massey stated that when she and her partner heard the radio call regarding the shooting, the information contained a description of the suspect. Thus, they decided to check the area as they were en route to look for possible suspects. Specifically, they were looking for an individual named "Travis" who was wearing lime green shoes. As they were driving, they encountered Boyd, an individual who fit the description, so they stopped, asked him his

---

[4] During a jury-out hearing, the State called Lieutenant Vivian Murray, who took Ms. Carlton's statement, as a witness. Following her testimony, the trial court found that the preponderance of the evidence supported that Ms. Carlton gave her statement under circumstances that would indicate trustworthiness and that her statement was admissible under Tennessee Rule of Evidence 803(26).

name, and detained him. They drove back to the crime scene with Boyd, where investigators advised them to take him to the homicide division of the police department. Officer Massey stated that they never removed Boyd from the cruiser and that they were at the scene for a short time.

Officer Massey stated that they first observed Boyd around a mile to a mile and a half away from the crime scene. The arrest ticket indicated that he was detained at 3:05 p.m. On cross-examination, Officer Massey agreed that if the dispatch log stated that they left the scene at 3:55 p.m., she would have no reason to dispute that information.

MPD Officer Sam Blue, a crime scene investigator, identified a sketch that another officer made of the crime scene as well as photographs that he took of the scene. Through him, shell casings recovered at the scene were admitted into evidence.

The State called Zaviaus Miller as its next witness, who knew the victim only by his nickname, "Andy." Mr. Miller stated that he arrived at the barber shop with Narvin Boyd in a burgundy-colored Cadillac. He was walking toward the barber shop when someone began shooting. Mr. Miller, in turn, ducked and started running. During his testimony, Mr. Miller claimed that officers disavowed his statement and threatened to charge him with first degree murder if he did not implicate the shooter(s). He stated that the police "basically" wrote the statement and made him sign it.[5] When asked about specific facts in the statement, Mr. Miller denied having given those answers during his police interview. He denied seeing either appellant at the barber shop on the day in question and denied seeing them drive up in a green Cavalier. He acknowledged identifying both appellants and Narvin Boyd in photographic arrays while at the police station.

MPD Lieutenant Anthony Mullins testified that on the day of the victim's murder, he was working as a homicide officer and that he came into contact with Boyd during the course of the investigation. Lieutenant Mullins observed the clothing Boyd was wearing that day and requested that the crime scene unit photograph and collect the clothing. Through Lieutenant Mullins, the clothing was admitted into evidence.

Lieutenant Mullins stated that he first came into contact with Zaviaus Miller at the homicide office. He was unaware of how Mr. Miller came to be at the police station. Other officers were attempting to interview Mr. Miller, and when they ceased the

---

[5] During a jury-out hearing, the State called Lieutenant Anthony Mullins, who took Mr. Miller's statement, as a witness. Following his testimony, the trial court found that the preponderance of the evidence supported that Mr. Miller gave his statement under circumstances that would indicate trustworthiness and that his statement was admissible under Tennessee Rule of Evidence 803(26).

interview and left the room, Mr. Miller began "yelling and hollering that he want[ed] somebody to come talk to him." Accordingly, Lieutenant Mullins checked on Mr. Miller, and when Mr. Miller recognized Lieutenant Mullins from a previous case, Mr. Miller said he wanted to speak with Lieutenant Mullins about the murder. Lieutenant Mullins said that Mr. Miller had already been read his rights because he was a possible suspect in the homicide. Mr. Miller agreed to give Lieutenant Mullins a statement, which was recited in part for the jury. In the statement, Mr. Miller implicated Boyd as the shooter; Mr. Miller acknowledged having been at the scene and having witnessed Boyd shoot the victim. He surmised that the motive behind the shooting had something to do with Narvin Boyd. Mr. Miller was present because Narvin Boyd was dropping him off at the barber shop. Boyd did not ride with them; he arrived separately in a green Cavalier with "Rod."

Specifically, Mr. Miller stated:

Well[,] I called [Narvin Boyd] about noon or a little before noon on Tuesday so I could get me a haircut. He had already told me he'll take me but he said he wasn't gonna stick around 'cause he had smacked a dude up there earlier that morning. So when I got on the lot in the burgundy Cadillac, I hopped out the car and then I was walking to the front of the barbershop, [Boyd] was already walking up there as well. [Boyd] got up there before I did and when he got up there, him and [the victim] had words, a few words. It couldn't been more than thirty seconds to a minute that they had been arguing in front of the barber shop. [The victim] jumped up and took off running and [Boyd] start[ed] shooting after that. [Boyd] chased [the victim] down to the end of the store and still was shooting, it was like 7 shots. I was already in the Cadillac pulling off the lot. We pulled off the lot, we turned off Whitney and the car died.

Mr. Miller indicated in his statement that the victim was holding a beer bottle in his hand and that he did not have a gun. He described Boyd's gun as being a black and silver automatic weapon and said that he did not know what became of the weapon. Mr. Miller said that he saw Boyd earlier in the day when they "smoked" but that he did not know that Boyd intended to confront or shoot the victim. Mr. Miller affirmed in his statement that he knew Narvin Boyd, Travis Boyd, and Funzie and that he wrote their names and signed the corresponding photographic array containing their pictures.

Dr. Marco Ross, a Shelby County medical examiner, was offered as an expert witness in the field of forensic pathology and was accepted as the same by the trial court. Dr. Ross testified that the victim suffered a gunshot wound to the chest region as a result of an entrance wound in the victim's back. The bullet traveled through the fourth rib on the left side and punctured the upper part of the left lung. The bullet exited just behind

the collarbone where it meets the sternum or chest bone. The victim's toxicology report indicated a positive result for alcohol at twenty-one milligrams per deciliter, or 0.021 on a "breathalyzer" scale. No other illegal substances were detected. Dr. Ross opined that the victim's cause of death was a gunshot wound to the chest.

On cross-examination, Dr. Ross stated that the maximum length of time a person with this type of injury could live without medical intervention would be one hour. He noted from his review of the record that the victim was shot around 2:39 p.m. and that he arrived at the hospital by ambulance around 3:00 p.m.

The State presented MPD Officer Juaquatta Harris, whose employment involved monitoring and disseminating inmate telephone calls. She said that the recording of jail telephone calls is initiated by a request from a law enforcement agency. Each inmate has a unique RNI number, which is used to retain and store the calls. They also log information from databases to assist in identifying the calls for which they are searching, such as co-defendants' names, addresses, and telephone numbers. To begin a recording, Officer Harris would input an inmate's RNI number into their telephone system, and any calls that were placed using that unique RNI number would appear. She would then listen to each of the calls, using the above criteria, to confirm that the person whom she was trying to record was actually the person on the call. She would then note the telephone number that was dialed. A cross-reference system was also in place in the event that an inmate allowed someone else to place a call using his RNI number.

Through Officer Harris, recordings of telephone calls placed by both appellants while in jail were identified, introduced into evidence, and played for the jury. Officer Harris testified that in addition to the above safeguards that she utilized, she was also familiar with Funzie's voice.

The State's final witness was MPD Lieutenant Vivian Murray, the case officer for the investigation. When she arrived at the scene, officers had secured the witnesses and had taped off the crime scene. Lieutenant Murray was given a description of the shooter, and officers had already broadcast the description over the radio. An officer soon advised that he had located an individual matching the suspect's description and that the individual gave the name of "Travis" when asked. Boyd was arrested and was briefly brought to the crime scene then transported to the jail. Lieutenant Murray confirmed that Boyd was not removed from the vehicle while at the scene and that no one was permitted to view him. Witnesses were also taken to the police department, and investigators were asked to begin interviews upon the witnesses' arrival.

Lieutenant Murray testified that her presence was required at the scene but that after the crime scene sketch had been completed, she returned to her office. During the course of the investigation, she received the names of three individuals who could

allegedly provide alibis for both appellants. One of those individuals was Andrea Carlton, who gave Lieutenant Murray a statement. Through Lieutenant Murray, the State introduced the statement of Ms. Carlton.

Lieutenant Murray stated that while giving her statement, Ms. Carlton viewed the video surveillance tape and identified Boyd and Funzie's automobile. She said that Ms. Carlton was upset because she wanted to know who would involve her as an alibi to a homicide. Lieutenant Murray recalled that as part of the interview procedure, she would assess whether the interviewee was under the influence of alcohol, an intoxicant, or drugs. She said that Ms. Carlton signed, initialed, and dated her statement and that according to her observation, Ms. Carlton was not under the influence of alcohol or drugs at the time she gave her statement. In fact, Lieutenant Murray stated that she would be "surprised" to learn that Ms. Carlton had ingested drugs because she exhibited no signs of being under the influence.

Lieutenant Murray also interviewed Funzie, who reported to the police station on his own volition. Funzie said that he had an appointment to get his hair cut on the day in question. He pulled up to the strip mall and began to exit but saw his barber sitting outside and heard gunshots, so he drove away. When Lieutenant Murray confronted him with the videotape, Funzie "didn't say anything. He just kind of looked at the video screen, dropped his head, took like a sigh or a deep breath, and then told me[,] ['][Y']all can just take [me] back to jail.['"] Lieutenant Murray did not take Boyd's statement.

Lieutenant Murray testified that through the use of an alternative light source, she identified gunshot residue on Boyd's hands. However, no swabs were submitted to the Tennessee Bureau of Investigation ("TBI") for confirmation.

Lieutenant Murray stated that she was unaware of the exact time that she arrived at the crime scene. However, she recalled that Boyd was brought to the scene while she was there. She agreed that the arrest ticket indicated that Boyd arrived at the scene in police custody at 3:16 p.m. and that he was taken from the crime scene at 3:55 p.m. She acknowledged that the arrest ticket indicated that Boyd was apprehended by police at 3:05 p.m. Lieutenant Murray said that she was not aware that Boyd was present at the crime scene for that duration of time. She denied that the purpose in taking Boyd to the crime scene was for a "show-up" identification of him. She did not have any contact with Boyd while he was present.

Lieutenant Murray testified that Boyd was placed on a forty-eight-hour hold upon his arrest and that she had probable cause to detain him. Specifically, she reviewed the evidence in support of his detention that police had amassed thus far in the investigation: "[Narvin Boyd's] brother had been implicated; the name "Travis" had been given to

police by eyewitnesses to the crime; Boyd matched the description of the suspect that had been supplied to the police; and, officers verified the relationship between Narvin Boyd and Travis Boyd." Lieutenant Murray stated that Funzie arrived at the police station on his own, where he was subsequently detained.

The State then introduced the contents of telephone calls that each appellant made while in custody, as follows: calls placed by Boyd on 9/13/2011, at 23:45, and on 9/14/2011, at 00:13, 00:34, and 00:43; and a call placed by Funzie on 9/23/2011, at 10:16. Thereupon, the State rested its case-in-chief.

Boyd recalled Mr. Miller as a witness. Mr. Miller testified that his statement bore his initials but that he did not initial the statement. He also claimed that he did not sign the identification of Boyd on the photographic array and noted that his name was misspelled in the signature. However, he acknowledged that he was familiar with Boyd and Funzie and that he could have identified them nonetheless.

On cross-examination, Mr. Miller acknowledged that in his initial testimony, he said that officers made him sign the statement but that at that point, he had not had time to review his statement fully. He explained that officers made him correct "mistakes" in his statement and that they forged his signature. He agreed that he would have had no problem identifying both appellants but that he simply did not sign the identifications. He clarified that he identified Narvin Boyd and Funzie but not Travis Boyd. He claimed that he was forced to initial his statement or face a first degree murder charge.

Sebias Johnson was Boyd's next witness. She testified that she was the mother of Boyd's child. She said that Boyd telephoned her for a ride to his grandmother's house on September 13 between noon and 1:00 p.m. She maintained that she picked him up from The Villages apartments and drove him to Sandpiper Avenue. She waited at the residence while Boyd assisted his family in caring for his disabled uncle. She planned to drive him back to The Villages, but while en route, Boyd's cellular telephone kept ringing, and he silenced it. This angered Ms. Johnson because she believed the calls were being placed by a female. Accordingly, she stopped her vehicle on Range Line Road and demanded that Boyd exit immediately. She estimated that the time was 2:00 p.m. or shortly thereafter. On cross-examination, Ms. Johnson acknowledged that Boyd shared a vehicle with his mother but stated that she worked two jobs, thus implying that she was using the vehicle at that time. She admitted that she was acquainted with Funzie but denied knowing Mr. Miller.

Boyd presented Dustin Carter as a witness. Mr. Carter said that he picked up Boyd from his mother's home around 10:00 a.m. and drove him to Ms. Carlton's residence at The Villages apartments to assist Ms. Carlton in packing boxes because she was moving. He recalled that Ms. Johnson arrived to drive Boyd to his grandmother and

uncle's residence. Mr. Carter remained at Ms. Carlton's apartment until Boyd telephoned him approximately one hour later requesting a ride. He said that Boyd needed a ride because Ms. Johnson had left him stranded. Mr. Carter said that when he arrived at Boyd's location, he observed that Boyd had been detained by police. When the police drove away with Boyd, he followed the squad car to the EZ Store. In the interim, Mr. Carter telephoned Narvin Boyd and Boyd's father to inform them of what was transpiring.

On cross-examination, Mr. Carter stated that Mr. Miller was not present during this time. He clarified that he arrived at Ms. Clayton's residence around noon and that he remained there around two hours. Funzie was not present. He also stated that Boyd was away from Ms. Carlton's apartment approximately one to two hours before he telephoned for a ride. Mr. Carter said that he watched Boyd on Range Line Road for thirty minutes to one hour before the police drove away with him. He also watched Boyd at the EZ Store but did not exit his vehicle while there.

Cedric Davis was Boyd's last witness. He lived on Nunnelee Avenue with his wife and children. He recalled that on September 10, 2011, he went outside and learned that Mr. Jarvis had been robbed and that people were accusing Narvin Boyd of the crime. Mr. Davis was talking to Mr. Jarvis's uncle, "Melvin," when other individuals gathered. "Words" were exchanged wherein the victim accused Narvin Boyd of being involved. Mr. Davis claimed that the victim then pulled up his shirt to reveal a black handgun. At that time, Narvin Boyd was on Mr. Davis's porch, but he then started to walk down the street. Mr. Davis stopped Narvin Boyd and told him not to get involved because it was in "the best of [their] interest to leave." Mr. Davis said he never saw Travis Boyd that night and that Narvin Boyd left forthwith. Mr. Davis said that on September 13, 2011, between 11:30 p.m. and 12:00 a.m., his home was "shot up" and that it occurred again ten days later.

Upon this proof, Boyd rested his defense. Funzie rested without presenting evidence. The State called MPD Lieutenant Darren Goods as a rebuttal witness, who testified that he took Boyd's statement. In the statement, Boyd claimed that he was picked up by Mr. Carter from his mother's residence and that Mr. Miller was present at the time. Boyd said that they proceeded to someone's girlfriend's residence to try to gather rent money so that she would not be evicted. When they left that residence, Mr. Carter allegedly dropped off Boyd "in the neighborhood sometime." He said that he eventually arrived at the home of his girlfriend but that they argued and she made him leave. He was then arrested.

On cross-examination, Lieutenant Goods acknowledged that the supplement to his report indicated that Boyd said that later in the day, he telephoned his girlfriend and

asked her to pick him up and take him to his aunt and uncle's house on Sandpiper Avenue but that on the way, they argued and she forced him from her vehicle.

Following deliberations, the jury found both appellants guilty of first degree murder as charged in the indictment. The trial court imposed automatic sentences of life in prison. Each appellant now appeals his conviction.

## II. Analysis

In this appeal, both appellants challenge the sufficiency of the convicting evidence and the trial court's admission of recorded jail conversations. Boyd challenges the trial court's ruling allowing testimony concerning the altercation between Boyd and the victim on the Saturday night prior to the murder; the admission of evidence gathered during the course of Boyd's allegedly illegal forty-eight-hour hold; the trial court's ruling allowing identifications of Boyd by Mr. Henderson, Mr. Hemphill, Mr. Shaw, Mr. Pitts, and Mr. Guy; and the State's failure to provide complete discovery. Funzie challenges the trial court's admission of the statements of Mr. Miller and Ms. Carlton as substantive evidence.

### A. Sufficiency of the Evidence

### 1. Standard of Review

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual

disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

## 2. Boyd

As indicted in this case, first degree murder is the premeditated and intentional killing of another. Tenn. Code Ann. § 39-13-202(a)(1). "'[P]remeditation' is an act done after the exercise of reflection and judgment. '[P]remeditation' means that the intent to kill must have been formed prior to the act itself." *Id.* § 39-13-202(d).

Boyd's specific challenge to the sufficiency of the evidence involves the credibility and veracity of the witnesses against him. He claims that "some of the witness[es'] testimony, in particular, Cory Hemphill's testimony, constituted perjury" and that "all of the State's witnesses had completely different stories of how the events took place and [the] physical description of the shooter." This court has previously stated,

> [Appellant's] challenge to the sufficiency of the evidence invites this court to revisit the question of the victim's credibility . . . . Because the resolution of questions of fact, including witness credibility, is within the province of the jury, we must decline the defendant's invitation. By its verdict, the jury accredited the [witness's] testimony despite its sometimes inconsistent nature on particular details.

*State v. Thompson*, 36 S.W.3d 102, 107 (Tenn. Crim. App. 2000); *see also State v. Stephens*, 264 S.W.3d 719, 740 (Tenn. Crim. App. 2007) (noting that appellant's challenge to the sufficiency of the evidence was based on the credibility of a witness and that this court will not discount the testimony of a witness and engage in a re-weighing or re-evaluation of the evidence on appeal). All witnesses were thoroughly cross-examined, and the jury assessed the testimony and evidence at trial. We will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379. Appellant is not entitled to relief on this claim.

-17-

Viewed in the light most favorable to the State, the evidence was sufficient to support Boyd's conviction for first degree murder. Mr. Henderson and Mr. Shaw provided evidence of premeditation stemming from the altercation that occurred on the Saturday prior to the victim's murder. Testimony from witnesses at the scene of the murder established that Boyd sought to rectify some pre-existing problem between his brother, Narvin Boyd, and the victim. Video surveillance tapes placed Boyd at the scene, fleeing in Funzie's automobile. Several eyewitnesses, including Mr. Henderson, Mr. Hemphill, Mr. Shaw, Mr. Pitts, and Mr. Guy, identified Boyd as the shooter. A gunshot residue test using an alternative light source confirmed the presence of gunshot residue on appellant's hands at the time of his arrest. The victim made a dying declaration implicating Narvin Boyd's brother, Travis Boyd, as the person who shot him. Boyd matched the description of the shooter that was disseminated through police dispatch, and he was wearing clothing consistent with that described by eyewitnesses. When asked his name, he answered, "Travis," which was also consistent with information gleaned at the crime scene. Boyd is not entitled to relief on this claim.

### 3. Funzie

In addition to charging the jury with respect to the elements of first degree murder, the trial court also instructed the jury on the theory of criminal responsibility:

> A person is criminally responsible for an offense committed by the conduct of another, if:
>
> (1)     Acting with the culpability required for the offense, the person causes or aids an innocent or irresponsible person to engage in conduct prohibited by the definition of the offense; [or]
>
> (2)     Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense.

*Id.* § 39-11-402.

Ms. Carlton and Funzie told police that he was wearing a white "wife-beater" undershirt, black jeans, a black hat, and red tennis shoes on the day of the murder. They both also told officers that he drove a green Cavalier automobile, and Funzie identified his vehicle on the videotape as it pulled into the parking lot of the EZ Store. The surveillance video depicts a male wearing the aforementioned clothing step out of the

-18-

above-described vehicle and walk away. The male then hastily changed directions and ran in front of the vehicle while chasing the victim around the corner of the building. When the male wearing Funzie's clothing returned to the vehicle, another individual jumped into the passenger seat, and they fled the area. Ms. Carlton identified Boyd and Funzie on the video. Witnesses Guy and Miller testified that Boyd exited a green or turquoise Cavalier and that he left the scene in the same vehicle. After being shown the video, Funzie told officers that "y'all can just take me to jail," which a jury could reasonably infer as an admission. Upon this evidence, a jury could have found that Funzie acted with the intent to promote or assist Boyd in the commission of first degree murder and was therefore guilty of first degree murder based on the theory of criminal responsibility for conduct of another.

## B. Admission of Evidence

Boyd contends that the trial court erred in admitting testimony concerning the altercation between the victim and Boyd on the Saturday night prior to the murder.

### 1. Standard of Review

The determination of whether evidence is relevant and admissible at trial is a matter left to the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *State v. Dellinger*, 79 S.W.3d 458, 485 (Tenn. 2002); *State v. McLeod*, 937 S.W.2d 867, 871 (Tenn. 1996). "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. All relevant evidence is admissible unless specifically excepted by constitution, statute, rules of evidence, or rules of general application. Tenn. R. Evid. 402. One such exception is that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. "Unfair prejudice" is "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Tenn. R. Evid. 403, Adv. Comm. Note).

### 2. Evidence of Prior Altercation

Boyd contends that Mr. Henderson's testimony regarding the evidence of the prior altercation between Boyd and the victim should not have been allowed. He claims that it was irrelevant and that Mr. Henderson's identification of Boyd was equivocal and tainted. As such, he maintains that "all testimony regarding Saturday night's altercation should have been stricken."

We conclude that the trial court properly admitted Mr. Henderson's testimony regarding the prior altercation as being relevant to the issue of premeditation. *See, e.g., State v. Smith*, 868 S.W.2d 561, 578 (Tenn. 1991) (affirming that evidence defined in Tennessee Rule of Evidence 404(b) is admissible if it "is relevant to establish intent, deliberation and premeditation"). With regard to Mr. Henderson's identification of Boyd, the trial court properly submitted the issue to the jury for determination, stating that the jury could attribute it with "whatever weight [the jury] want[ed] to give it." We agree with the trial court that it was within the province of the jury to weigh Mr. Henderson's identification of Boyd and to give it such credence as it deemed proper.

Moreover, Boyd makes an inferential leap between his challenges to Mr. Henderson's testimony and identification of Boyd to the contention that "all testimony" regarding the altercation should have been stricken. He makes no argument concerning the inadmissibility of the remaining witnesses' testimony to the altercation and the testimony of individuals who were familiar with Boyd. As noted above, the evidence was relevant to establish premeditation and was properly admitted. Boyd is not entitled to relief on this claim.

### 3. Forty-Eight-Hour Hold/Recorded Jail Conversations

Boyd claims that evidence collected in violation of *State v. Bishop*, 431 S.W.3d 22 (Tenn. 2014), and *Gerstein v. Pugh*, 420 U.S. 103 (1975), as a result of his being held on a forty-eight-hour hold should have been suppressed.

The law requires that when a person is arrested without a warrant, he or she must be brought "before a magistrate to 'seek a prompt judicial determination of probable cause.'" *Bishop*, 431 S.W.3d at 42 (quoting *Gerstein*, 420 U.S. at 125 (holding that "the Fourth Amendment requires a timely judicial determination of probable cause as a prerequisite to detention")); *see also State v. Huddleston*, 924 S.W.2d 666, 672 n.2 (Tenn. 1996). Tennessee Rule of Criminal Procedure 5(a)(1) provides that "[a]ny person arrested—except upon a capias pursuant to an indictment or presentment—shall be taken without unnecessary delay before the nearest appropriate magistrate." The Tennessee Supreme Court has recently stated that "a delay of less than forty-eight hours is presumptively reasonable" and that when the delay exceeds forty-eight hours, the State must show that "'a bona fide emergency or other extraordinary circumstance' caused the delay." *Bishop*, 431 S.W.3d at 42 (quoting *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991)). Nonetheless, even a delay of less than forty-eight hours may be unreasonable "if the delay is 'for the purpose of gathering additional evidence to justify the arrest' or if the delay is 'motivated by ill will against the arrested individual, or delay for delay's sake.'" *Id.* (quoting *McLaughlin*, 500 U.S. at 56). "Courts cannot ignore the often unavoidable delays in transporting arrested persons from one facility to another, handling late-night bookings where no magistrate is readily available, obtaining the

presence of an arresting officer who may be busy processing other suspects or securing the premises of an arrest, and other practical realities." *McLaughlin*, 500 U.S. at 56-57.

The remedy for failing to bring an arrestee before a magistrate without unnecessary delay is exclusion of "any evidence obtained by virtue of a suspect's unlawful detention," unless an exception to the exclusionary rule applies. *Bishop*, 431 S.W.3d at 42 (citing *Huddleston*, 924 S.W.2d at 673-75). However, "when a suspect is arrested based on probable cause, the ensuing detention is typically not illegal until it 'ripens' into a *Gerstein* violation." *Id.* (citing *Huddleston*, 924 S.W.2d at 675). "Obviously, if [an arrestee's] statement was given prior to the time the detention ripened into a constitutional violation, it is not the product of the illegality and should not be suppressed." *Huddleston*, 924 S .W.2d at 675.

Initially, we note several faults with Boyd's argument. First, Boyd has failed to prove the existence of a delay in charging him with first degree murder that was either presumptively unreasonable in length or that could be characterized as being made for the purpose of gathering additional evidence or "delay for delay's sake." *Bishop*, 431 S.W.3d at 42 (internal quotation marks omitted). The only "proof" he presented that he was held in excess of forty-eight hours was a copy of his arrest ticket that was appended to his brief. This court has repeatedly held that documents appended to appellate briefs that were not admitted to the trial court do not constitute evidence. *See* Tenn. R. App. P. 24(g); *Grover L. Dunigan v. State*, No. E2005-01574-CCA-R3-PC, 2006 WL 433699, at *3 (Tenn. Crim. App. Feb. 23, 2006).

Second, Boyd neither filed a motion to suppress any allegedly illegally obtained evidence nor contemporaneously objected to the introduction of any such evidence. Boyd had a duty to mitigate any perceived error by either filing said motion and/or objecting at trial. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").[6]

Third, Boyd states that "the lack of probable cause coupled with the unconstitutional 48-hour hold renders [his] statement invalid." Our review of the record indicates that Boyd did not give a statement that was admitted into evidence. Fourth, Boyd cites a dearth of evidence against him; however, Lieutenant Murray summarized the evidence in support of Boyd's detention that police had amassed thus far in the

---

[6] However, because *Bishop* criticized this court's failure to employ a plain error review of a *Gerstein* violation, despite the fact that the same conclusion would have been reached, we will nonetheless consider whether Boyd's issue is reviewable for plain error. *Bishop*, 431 S.W.3d at 45; Tenn. R. App. P. 36(b).

investigation: "[Narvin Boyd's] brother had been implicated; the name "Travis" had been given to police by eyewitnesses to the crime; Boyd matched the description of the suspect that had been supplied to the police; and, officers verified the relationship between Narvin Boyd and Travis Boyd." Fifth, Boyd asserts that as in the *Bishop* case, "the State offered no other proof at trial that the appellant was at the scene of the crime or even fired the shots that killed the victim." This statement is rife with inconsistencies. Indeed, the State offered a plethora of proof in the form of video surveillance and eyewitness testimony that established that Boyd was at the scene and that he fired the fatal shots.

In fact, the only "evidence" to which Boyd points as having been admitted in violation of *Bishop* and *Gerstein* were the recorded jail conversations. Our analysis necessarily involves a determination of whether the police had probable cause to arrest him. As fully set forth above, Lieutenant Murray reviewed the probable cause supporting Boyd's arrest. We conclude that because the police had probable cause to arrest Boyd at or near the time of his detention, his jail recordings were not introduced in violation of *Bishop* and *Gerstein*.

A further examination of the grounds asserted by Boyd for exclusion of the recorded jail conversations does not fall within the purview of *Bishop* that mandates plain error review. As an additional basis for relief, Boyd asserts that he "made further objections at trial that the recording should not be admitted because they were offered in pieces." This statement is inaccurate; in fact, counsel expressly agreed with the trial court's ruling, stating that he "did not have a problem with the court's ruling as to the jail phone calls." Prior to the recordings being played for the jury, the trial court asked if counsel wanted the entire conversations played. Boyd's counsel responded, "I'm tired of phone calls. Whatever they play, they play," thus assenting to the trial court's decision. Moreover, at the hearing on the motion for new trial, counsel acknowledged that he never objected to playing the recordings in a piecemeal fashion because it was his position that he did not want the tapes played in their entirety. Boyd may not assert one ground for relief in the trial court and then pursue a new or different theory on appeal. *State v. Adkisson*, 899 S.W.2d 626, 634-35 (Tenn. Crim. App. 1994). In this case, Boyd has failed to establish the need for plain error review and has failed to cite any legal authority regarding this issue in his appellate brief. *See* Tenn. R. App. P. 36(b); Tenn. Ct. Crim. App. R. 10(b). Therefore, Boyd has waived this issue for failure to object contemporaneously and for preparing an inadequate brief. Tenn. Ct. Crim. App. R. 10(b); *Banks*, 271 S.W.3d at 132. He is without relief on this claim of error.

Funzie asserts that his jail recordings were inadmissible because they were not properly authenticated. The trial court held a jury-out hearing and concluded that the jail record keeper had properly authenticated the telephone calls. Accordingly, the trial court's ruling is subject to a review for abuse of discretion.

Tennessee Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." *State v. Morris Marsh*, No. E2013-01343-CCA-R3-CD, 2014 WL 4366087, at *14 (Tenn. Crim. App. Sept. 4, 2014). Subsection (b) of Rule 901 lists "[b]y way of illustration only, and not by way of limitation," examples of authentication that would satisfy the evidentiary requirement. One such method is "[i]dentification of a voice . . . by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." *Morris Marsh*, 2014 WL 4366087, at *14 (citing Tenn. R. Evid. 901(b)(5)). An additional method was approved by our court in *State v. Hinton*, 42 S.W.3d 113, 127 (Tenn. Crim. App. 2000), wherein this court held that "an audio recording of a 9-1-1 phone call had been properly authenticated when the custodian of the recording explained the process by which the recording was 'processed and retrieved,' stated the time and date of the phone call, and the address associated with the phone number from which the phone call originated." *Morris Marsh*, 2014 WL 4366087, at *14.

In this case, Officer Juaquatta Harris testified with regard to the procedures utilized in recording and authenticating jail telephone calls. The trial court did not abuse its discretion in admitting the recorded telephone calls.

### 4. Statements of Ms. Carlton and Mr. Miller

Funzie argues that the trial court erred in admitting the statements of Ms. Carlton and Mr. Miller as substantive evidence. The State responds that the trial court committed no error.

### a. Andrea Carlton

Funzie asserts that evidence of Ms. Carlton's intoxication during the time she gave her statement should have rendered her statement inadmissible.

According to the record, the trial court held a hearing and determined by a preponderance of the evidence that Ms. Carlton's statement was given under circumstances indicating trustworthiness. Accordingly, pursuant to Tennessee Rule of Evidence 803(26), Ms. Carlton's statement was admissible as substantive evidence. The rule provides a hearsay exception allowing a witness's prior inconsistent statement to be introduced as substantive evidence if it is otherwise admissible under Tennessee Rule of Evidence 613, the declarant testifies at trial and is subject to cross-examination, the statement was written and signed by the affiant or given under oath, and the trial court conducts a jury-out hearing and determines by a preponderance of the evidence that the

statement was given under circumstances indicating trustworthiness.  Each of these procedural hurdles was met in this case.

As to Ms. Carlton's claim of intoxication, Lieutenant Murray provided conflicting evidence, stating that according to her trained observation, Ms. Carlton was not under the influence of an intoxicant.  To the contrary, it would have "surprised" Lieutenant Murray if Ms. Carlton had been under the influence.  The trial court did not abuse its discretion in allowing Ms. Carlton's statement to be introduced as substantive evidence.

### b.  Zaviaus Miller

Funzie argues that Mr. Miller's statement was improperly admitted as substantive evidence because he consistently maintained that his statement was involuntary and that he signed the statement under threat of prosecution.

Consistent with the requirements of Tennessee Rule of Evidence 803(26), the trial court held a jury-out hearing and heard the testimony of Lieutenant Mullins, who took Mr. Miller's statement.  The trial court determined by a preponderance of the evidence that the statement was given under circumstances indicating trustworthiness.  The trial court heard conflicting testimony from Lieutenant Mullins and Mr. Miller and made a credibility determination that we will not second-guess.  Upon the record before us, we cannot say that the trial court abused its discretion in admitting Mr. Miller's statement as substantive evidence.

### C.  Denial of Boyd's Motion to Suppress

Boyd contends that he was taken to the crime scene after his arrest for the purpose of officers' conducting a "show-up" identification of him and that the trial court erred in denying his motion to suppress on this ground.  However, the record belies this contention.[7]  Each officer who testified with regard to Boyd's presence at the crime scene vehemently denied that appellant was transported to the scene for that purpose.  Lieutenant Murray confirmed that appellant was never removed from the police squad car and that no one was permitted to "view" him while he was inside the vehicle.  Moreover, no trial testimony was elicited from any eyewitness indicating he or she made an

---

[7]  As noted above in the summary of the hearing on Boyd's motion to suppress, that hearing was apparently a continuation of a prior hearing, which is not included in the appellate record.  Boyd makes reference to "testimony" that was allegedly taken at the prior hearing.  In addition to failing to include a transcript of the motion to suppress that Boyd references, he also failed to support this issue with citations to the record or citation to legal authorities, both of which result in waiver of the issue on appeal.  Nonetheless, we have addressed this issue for the sole purpose of clarifying that this issue is factually moot, as explained herein.

identification of Boyd while he was in the car in police custody. This position is unsupported by the evidence and affords Boyd no relief.

Without further argument, Boyd also summarily asserts that "the untruthful and intentionally misleading testimony by the witnesses[] Ryan Henderson, Cory Hemphill, Alvin Shaw, Michael Pitts[,] and Courtney Guy makes their respective identifications highly untrustworthy" due to the varying details of their testimony. This issue of credibility presents a matter of fact for the jury, which we will not second-guess or revisit. *Dorantes*, 331 S.W.3d at 379. Boyd is not entitled to relief on this basis.

### D. Discovery/*Brady v. Maryland* Violation

Boyd takes issue with the discovery provided by State, claiming that the State denied him copies of certain documents and that he received no discovery from the State regarding the recovery of a 9mm handgun. Decisions regarding pretrial discovery are inherently discretionary and are, thus, reviewed using the "abuse of discretion" standard of review. *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010).

At the hearing on the motion for new trial, the State maintained that it offered Boyd open-file discovery in this case and that counsel would initial the evidence as proof he had reviewed it. The State argued that it ceased open-file discovery when counsel declined to initial any further evidence. Even so, in a pre-trial hearing, the State asserted that it had provided Boyd with all discovery due him. The trial court concluded that the State complied with the rules of discovery. No evidence has been presented to refute the trial court's exercise of its discretion in denying relief on this issue at the motion for new trial hearing. Boyd is not entitled to relief on this claim.

With regard to his claims under *Brady v. Maryland*, 373 U.S. 83 (1963), Boyd asserts that he "proceeded to trial where there was evidence of gunshot residue test kits, a Ruger [Luger] 9 millimeter handgun and [five] spent shell casings [that] were never tested." This court summarized the application of *Brady* as follows:

> In *Brady v. Maryland*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution." In *United States v. Bagley*, the Supreme Court held that both exculpatory and impeachment evidence fall under the *Brady* rule.
>
> Before an accused is entitled to relief under this theory, he must establish several prerequisites: (a) the defendant requested the information, unless the information was obviously exculpatory; (b) the prosecution must

have suppressed the evidence; (c) the evidence suppressed must have been favorable to the accused; and (d) the evidence must have been material.

. . . .

Evidence is considered material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the results of the proceeding would have been different. In *Kyles*, the United States Supreme Court explained that "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . ." Rather, the question is whether the defendant received a fair trial, "understood as a trial resulting in a verdict worthy of confidence," in the absence of the suppressed evidence. In order to prove a *Brady* violation, a defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." The Court in *Kyles* urged that the cumulative effect of the suppressed evidence be considered to determine materiality. Thus, the materiality of the suppressed evidence must be evaluated within the context of the entire record as to how it impacts the innocence or guilt of the accused.

*Jordan v. State*, 343 S.W.3d 84, 96-97 (Tenn. Crim. App. 2011) (internal citations omitted).

Boyd's *Brady* claims fail for several reasons. Boyd has failed to establish that the gun was exculpatory, which would have mandated automatic disclosure by the State. Moreover, Boyd had open-file access to the State's file until he declined to initial the discovery he viewed. He cannot establish the first prong of *Brady*. Likewise, he has not shown that the State suppressed the information. Moreover, without any evidence about the ownership of the gun, where the gun was discovered, or the method by which it was discovered, it cannot be said that the gun was favorable to the defense. Finally, the trial court noted that the issue of a handgun was not litigated; it noted that the gun that was tested was not the murder weapon and that no ballistics evidence was presented at trial. Boyd cannot show that evidence with regard to the handgun was material. He is not entitled to relief on this claim.

**CONCLUSION**

Based on the record as a whole, the briefs of the parties, arguments of counsel, and applicable legal authority, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE